J-S43039-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| BETHANN ZAMPERINI | |
| Appellant | No. 191 WDA 2017 |

Appeal from the Judgment of Sentence January 19, 2017
In the Court of Common Pleas of Butler County
Criminal Division at No(s):  CP-10-CR-0001174-2016

BEFORE: STABILE, SOLANO, and FITZGERALD[*] JJ.

MEMORANDUM BY FITZGERALD, J.:              **FILED JULY 28, 2017**

Appellant, Bethann Zamperini, appeals from the judgment of sentence entered in the Butler County Court of Common Pleas following her conviction in a non-jury trial of driving under the influence[1] ("DUI) and speeding.[2] Appellant contends the evidence was insufficient to sustain a guilty verdict for DUI.  We affirm.

At trial, Officer Christopher Miller, patrolman for the Jackson Township Police Department, testified for the Commonwealth.

> The Commonwealth: Officer, I want to draw your attention to the early morning hours of February twenty-fourth, two thousand and sixteen. . . .

---

[*] Former Justice specially assigned to the Superior Court.

[1] 75 Pa.C.S. § 3802(a).

[2] 75 Pa.C.S. § 3362(a)(3).

* * *

Can you tell us how you came into contact with [Appellant] that night?

A: I was stationed at the RE/MAX Building on Route nineteen. In front of the building there are two sets of two hundred foot speed lines. I was exposed in a manner that I could observe both sets of lines, and I observed the vehicle traveling southbound. It was clearly traveling at a high rate of speed. I timed at least twenty miles over the speed limit. It was clocked with department AccuTracker. I got seventy-four point eight in a posted fifty mile an hour zone there. I initiated a traffic stop on the vehicle . . . . I made contact with the driver. After sometime she was able to produce her driver's license. . . . Through the course of speaking with her through the window I could detect an odor of an alcoholic beverage, intoxicating beverage coming out of the vehicle. She was the only occupant in the vehicle. I asked her if she had been drinking. She said, no. I asked her where she was coming from. She said Three B's, which was a bar in Zelienople. She said she was bartending and had just finished. While speaking with her I could detect that, observed her speech to be a little slurred. Her eyes also appeared glassy and bloodshot. I asked that she step from the vehicle at that point.

* * *

[The Commonwealth]: . . . How were you able to see the lines?

A: I, you could see the lines when the headlights first hit the lines itself it illuminates them. I sit there in total darkness, and, you know, I am able to see the lines without any lighting from vehicles passing, but, I mean, it's even more pronounced when a vehicle passes through.

Q: Was there any other traffic on the road at that time.

A: Very light. She was by herself in that vehicle.

* * *

Q: [W]hat else did you observe with your initial contact with her?

A: Her speech was slurred at times. When I asked her to produce her driver's license, it took her a little bit longer than what a reasonable person [sic]. She seemed to fumble with some of her items in her wallet. She avoided eye contact with me, didn't want to answer really many questions that I asked her, during the course of that conduct, contact.

\* \* \*

Q: [W]hat did you do next?

A: I asked her to step from the vehicle, to perform standardized field sobriety [sic] to which she did and she agreed to do that.

Q: Which test did she perform?

A: We conducted the HG[N Horizontal Gaze Nystagmus], walk and turn, one leg stand, and she was also issued a PBT [pre-arrest breath test] at the end of that.

Q: Now, I don't want to get into the HGN.[3] We are not allowed to talk to [sic] about that in a trial. I want you to go through the walk and turn test and one leg stand and explain each one how she performed on each one of those tests if you would, please?

A: The walk and turn test is a series of there's [sic] eight clues that can be observed in a walk and turn test. She's instructed to remain in a ready position which would be her left foot on the line, right foot in front of it touching heel to toe, hands at side. I instruct her to remain in the position while I demonstrate the test. While I did that she started the test and started to walk. I had to stop her, tell

---

[3] HGN test results have been deemed scientific evidence by Pennsylvania courts, and therefore require an adequate foundation prior to their admissibility. *Commonwealth v. Stringer*, 678 A.2d 1200, 1201 (Pa. Super. 1996).

her to remain in that position. Once I demonstrated the test and asked her if she understood the test, she started the test and took eighteen steps and then stopped the test completely. I had to instruct her to turn, you know, finish the turn portion of the test and then return steps. So, she pivoted rather than take a series of small steps and then returned another eighteen to twenty steps on the way back to where she first started.

Q: How many clues did she show in that, performing that test?

A: In that there was four of eight.

Q: And what were those clues specifically?

A: She started the test too early. She took too many steps. She stopped the test and then she turned improperly.

Q: How many steps was she supposed to take?

A: Nine consecutive. Stop, take a series of small steps then return an additional nine steps.

\* \* \*

Q: Okay. You said the other test she did was the one leg stand. Explain how she performed on that?

A: She was again instructed to remain in a ready position while I demonstrated the test with her feet together and hands at her side. I conducted the test, demonstrated it for her and instructed her to begin. She indicated she understood. When I instructed her to begin, she was, during when I demonstrated the test she was instructed to take her right or left foot, didn't matter, raise it six inches from the ground keeping her legs straight and toe pointed forward parallel with the ground, her hands supposed to be kept at her side. While conducting the test count out loud by one thousandths until I tell her to stop. We timed the test. I use a stop watch on my personal phone and estimate a passage of thirty seconds. While she's doing the test she's supposed to remain, keep looking at her toe,

hands at her side, count out by one thousand, when I instructed her to do so she used her arms for balance and put her foot down at the twenty-five seconds. I instructed her to keep going. She picked her foot up, put it right down immediately again. With that test I observed two clues.

Q: That was going to be my next question. Are there clues connected with that test?

A: Four total.

Q: She showed two?

A: She showed two.

Q: Okay. And then what else did you observe with her in your interaction with her on the side of the road?

A: When I was conducting the HGN, I was up close with her. I could smell the odor of an alcoholic beverage, intoxicating beverage emanating from her person at that point. She was also when standing still would sway side to side, which gave me some other indications she was possibly over her limit of alcohol.

Q: And did you administer a PBT . . . ?

A: I did.

Q: Was it positive for alcohol?

A: It was positive, yes.

Q: Did you have any opinion at that point, Officer, about her condition to drive a motor vehicle?

A: It was my opinion at that point that she was over the legal limit, clearly, and placed her, took her into custody. I didn't feel comfortable to releasing [sic] her to driving the vehicle at that point.

N.T., 11/18/16, at 6-15.

Following the non-jury trial, Appellant was sentenced to five days to six months' imprisonment. This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and the trial court filed a responsive opinion.

Appellant raises the following issue for our review: "Was the Commonwealth's insufficient evidence of DUI/Impaired driving trumped by the Officer's opinion or was the evidence in this case legally insufficient to sustain a Verdict of Guilty?" Appellant's Brief at 6. Appellant avers

> Both the prosecutor and the [c]ourt mis-apply the law in this case. The Officer's job is to determine whether there is a probable cause to make an arrest or not, and no more. There is no challenge to him making this decision to arrest in this case, but he is not judge and jury. Courts must be cautious in accepting an arresting officer's opinion without any scrutiny. Particularly in a case such as this, a [t]rial [c]ourt should be slow to deviate from the long-standing holdings that opinion evidence is the lowest grade of evidence known in the law, and is not entitled too much weight against positive testimony of actual facts.

*Id.* at 14

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict.

\* \* \*

When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1235-37 (Pa. 2007) (citations and quotation marks omitted). Moreover, this standard requires that we review an undiminished record without regard to the admissibility of the evidence relied upon to render the verdict. ***Commonwealth v. Brown***, 52 A.3d 1139, 1188 (Pa. 2012).

Under section 3802(a)(1):

[A]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

75 Pa.C.S. § 3802(a)(1).

Section 3802(a)(1) . . . is a general provision and provides no specific restraint upon the Commonwealth in the manner in which it may prove that an accused operated a vehicle under the influence of alcohol to a degree which rendered him incapable of safe driving.

The types of evidence that the Commonwealth may proffer in a subsection 3802(a)(1) prosecution include but are not limited to, the following: the offender's actions and behavior, including manner of driving and ability to pass field sobriety tests; demeanor, including toward the investigating officer; physical appearance, particularly bloodshot eyes and other physical signs of intoxication; odor of alcohol, and slurred speech. . . . The weight to be assigned these various types of evidence presents a question for the fact-finder, who may rely on his or her

experience, common sense, and/or expert testimony. Regardless of the type of evidence that the Commonwealth proffers to support its case, the focus of subsection 3802(a)(1) remains on the inability of the individual to drive safely due to consumption of alcohol—not on a particular blood alcohol level.

***Commonwealth v. Segida***, 985 A.2d 871, 879 (Pa. 2009) (some citations and quotation marks omitted).

In the case *sub judice*, the trial court opined:

[Officer Miller] testified that he has been employed with Jackson Township for approximately eight and one-half ($8^1/_2$) years. He testified that he has received training in standardized field sobriety, . . . high risk traffic stops, drug paraphernalia, DUI detection, and speed detection.

Officer Miller testified that in the early morning hours of February 24, 2016 he was working the 11 p.m. to 7 a.m. shift and was stationed at the RE/MAX building on Route 19. He observed a vehicle traveling at a high rate of speed, clocked at over twenty (20) miles per hour over the speed limit . . . The officer initiated a traffic stop of the vehicle driven by [Appellant]. While speaking with [Appellant] through the vehicle's window, he testified that he detected the odor of an alcoholic beverage coming out of the vehicle. The officer also observed that [Appellant's] speech was a little slurred. Additionally, her eyes appeared glassy and bloodshot. While speaking with [Appellant], Officer Miller testified that she avoided eye contact with him and didn't want to answer all of his questions. He also mentioned that [Appellant] fumbled with some of the items in her wallet when he asked her to produce her driver's license.

Following this initial interaction, Officer Miller asked [Appellant] to exit her vehicle and perform standardized field sobriety to which she agreed. The walk and turn, one leg stand and PBT . . . were conducted. In the walk and turn test, [Appellant] demonstrated four (4) of eight (8) clues. In the one leg stand, [Appellant] demonstrated two (2) of four (4) clues. When Officer Miller administered the

> HGN . . . test, he testified that he smelled the odor of an alcoholic beverage on [Appellant]. He also observed [Appellant] swaying from side to side while attempting to stand still. The PBT indicated positive for alcohol.
>
> *  *  *
>
> This court concluded, after considering the officer's testimony and the arguments presented by the parties, that there was sufficient evidence to find [Appellant] guilty of § 3802(a)(1).

Trial Ct. Op., 3/16/17, at 2.

In the light of this evidence, we agree with the trial court that the evidence was sufficient to show Appellant was operating her vehicle and had "imbibe[d] a sufficient amount of alcohol such that [she was] rendered incapable of safely driving" under section 3802(a)(1). *See* 75 Pa.C.S. § 3802(a)(1); *Segida*, *supra*; *Ratsamy*, *supra*.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2017